# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| JANETTE KENNEDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:10-CV-0279-PPS-PRC |
| | ) | |
| UNITED STATES POSTAL SERVICE, | ) | |
| TANGELA BUSH, DONNA BLACK, | ) | |
| and DONALD HARRIS | ) | |
| | ) | |
| Defendants. | ) | |


## OPINION AND ORDER

Janette Kennedy claims that her former employer, the United States Postal Service, and some of its employees who were her supervisors, discriminated against her because of her attempts to take leave under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq*. She also claims that she was discriminated against based on her disability and age. (An earlier claim of race discrimination was voluntarily dismissed). The Defendants say that Kennedy was fired because she violated the terms of a Last Chance Agreement with excessive absenteeism, and so they seek summary judgment on all counts. Kennedy also seeks summary judgment on her FMLA and disability discrimination claims. For the reasons explained in detail below, the Kennedy's motion is denied and the Defendants' motion is GRANTED IN PART and DENIED IN PART.

# BACKGROUND[1]

Janette Kennedy started working for the United States Postal Service on July 2, 1979,

[DE 114 at 28, 30] and was terminated in January 2009 [DE 114 at 20, 179]. She is over the age

of 40. [DE 114 at 7]. Kennedy worked for USPS for 29 years, and would have been eligible for

retirement after 30 years of service [DE 114 at 32]. For the last ten years that she worked for

USPS, she was a distribution clerk [DE 114 at 30, 32-34; DE 115 at 15]. Kennedy started work

early, sometimes as early as 4 a.m.: she would unlock the facility, turn off the alarm, open the

front door to the post office, meet the truck that delivered the mail to Hammond, and sort the

mail and packages for carriers to deliver [DE 114 at 32-36].

Kennedy's supervisors during the time of the events that comprised this litigation were

Laureen Poindexter, who supervised her from August 2007 through August 2008 [DE 114 at 36,

43; DE 115 at 14], and then Donald Harris, who took over in August 2008 [DE 114 at 37, 150-

51; DE 118 at 4-5]. Donna Black was Kennedy's manager, and she was the manager of

Customer Services for the Hammond Main post office [DE 116 at 5-6]. Tangela Bush was the

Postmaster General for the Hammond Post Office from June 2007 through July 2011 [DE 117 at

5-6; DE 114 at 37].

While Kennedy worked at the Post Office, here is how the leave policies for sick time,

emergency time off, and FMLA leave worked: scheduled leave, like vacations that were

---

[1] The Defendants have filed a Motion to Strike portions of Kennedy's Statement of Genuine Disputes and Plaintiff's Additional Material Facts [DE 156], on the ground that the statement of facts fails to comply with Local Rule 56.1 of the Northern District of Indiana, and requests that the Court "strike and disregard all arguments and speculative remarks that are stated throughout" Kennedy's statement of facts [*Id.* at 5]. To the extent that Kennedy has included improper argument or speculation, the Court has disregarded them, and the motion is **GRANTED**.

requested before the employee took time off, was approved in advance by the employee submitting a Form 3971 [DE 114 at 49-50; DE 99-32; DE 118 at 9]. An unscheduled absence, or one not approved in advance, such as sick leave or emergencies, used to be handled by calling in to the Hammond Post Office to speak with a supervisor, but then the system was changed to a computer generated call-in system called eRMS [DE 114 at 44, 47; DE 115 at 63; DE 99-32]. The eRMS call-in system would direct the employee to enter her employee ID and to identify the type of leave the employee was taking: sick leave, annual leave, or FMLA leave [DE 114 at 47-48]. If the employee had an FMLA case number, she would enter the number while she was calling in [DE 114 at 167-68]. If she didn't, she could still request FMLA leave, and paperwork would be mailed to the employee's home [DE 118 at 53-54]. In those cases, the call-in system would generate a new case number, and the employee would have fifteen days in which to return the forms, providing the medical documentation for consideration of FMLA approval [DE 118 at 47; DE 99-1 at ¶ 8].

Before getting into the details of Kennedy's termination, some background is necessary. Around the year 2000, Kennedy began having serious health problems, including migraine headaches, chronic sinus infections (for which she had surgery), and depression, and she took FMLA leave for those conditions [DE 114 at 55-56, 67, 69, 227-34]. The migraine headaches caused pounding headaches, vomiting, irritation from light, dizziness, trouble sleeping, general misery and pain, and an inability to function [DE 114 at 62, 198, 200]. The sinus infections caused severe pain in her head, nasal cavity, and severe congestion [DE 114 at 62]. Kennedy's depression began in 2006, and she underwent counseling, treatment, and took medication [DE 114 at 59-61]. According to Kennedy, her migraines, sinus problems, and depression were

disabilities [DE 114 at 56, 177].  USPS contends that Kennedy did not request accommodations for her perceived disabilities [DE 117 at 101; DE 116 at 289]. But Kennedy contends that she did request accommodations in the form of brief absences because of her health problems.

Black was aware that Kennedy had been approved for FMLA leave in the past, but recalled only that it was for a sinus condition and sinus surgery [DE 116 at 291, 334].  Kennedy, however, contends that because Black was an FMLA coordinator in 2004 or 2005, she had personal knowledge of Kennedy's migraines because Poindexter had provided her with FMLA documents to that effect, and that USPS had documentation of Kennedy's migraines as early as 2002 [DE 116 at 16; DE 115 at 38; DE 151 at 3].

On April 4, 2006, Kennedy was approved for FMLA leave, assigned a case number, and instructed that she was to use the number when she called into the automated telephone system to request time off [DE 99-8; DE 99-1 at ¶ 9].  Kennedy was also informed that the approval (and therefore, the case number) would expire on September 30, 2006, and that she would need to resubmit a new request form to obtain further FMLA leave with her first absence thereafter [DE 99-8].  According to USPS employee materials, an employee was not required to recertify a serious health condition upon the first absence in the following leave year; instead, the certification from the previous leave year would remain valid for the duration that the healthcare provider had initially indicated, unless management required a recertification [DE 119].

On July 16, 2007, Kennedy used the call-in phone system to request FMLA time off, and to open a new case, since her prior case number had expired [DE 99-1 at ¶ 10; DE 99-9]. However, because she did not provide supporting documentation for the FMLA request, the Postal Service denied her FMLA leave request [DE 99-1 at ¶ 10; DE 99-10].  In August 2007,

Kennedy again applied for FMLA approval but was denied due to insufficient work hours [DE 114 at 237].

On October 9, 2007, Kennedy again used the call-in telephone system to make a request for FMLA leave [DE 99-1 at ¶ 11; DE 99-11]. The request was denied on October 11, 2007, because she had not worked the required 1,250 hours during the 26 pay periods leading up to October 9 [DE 99-1 at ¶ 11; DE 99-12]. According to the Postal Service, Kennedy had no FMLA approval on file from October 1, 2006, through 2008 [DE 99-1 at ¶¶ 13, 15].

Because of the series of unapproved absences, on November 6, 2007, Kennedy was given a notice of removal for failure to provide acceptable medical documentation for absences from July 16, 2007 through November 6, 2007 [DE 114 at 86-87; DE 99-17]. Kennedy filed a grievance regarding the removal, and on December 21, 2007, it was reduced to a thirty day last chance suspension [DE 99-18]. Between December 21, 2007 and February 8, 2008, Kennedy had eight unscheduled absences, and Poindexter, Kennedy's supervisor, initiated a Request for Removal [DE 99-19]. Black concurred with the removal [*Id.*]. On February 8, 2008, Poindexter interviewed Kennedy about the absences, and Kennedy did not say that they were due to migraines or that she wanted to use FMLA leave; however, Kennedy claims that she told Poindexter that the absences were out of her control, that she had sought help from an Employee Assistance Program, was seeing a doctor, and that she was doing the best that she could [DE 115 at 48-49, 208; DE 114 at 97-99, 313; DE 99-20]. Kennedy was again issued a notice of removal on February 12, 2008 for unsatisfactory attendance [DE 114 at 96; DE 115 at 171; DE 99-21].

On March 6, 2008, Kennedy sought FMLA approval for an absence, but she was denied approval because she had only worked 1165.20 hours in the preceding 26 pay periods [DE 114 at

255; DE 101-4].  She assumed that she would have sufficient hours worked within the next two

weeks, and she claims that subsequent Form 3971s confirmed that she became eligible for FMLA

on March 19, 2008 [DE 114 at 255-56].

In the meantime, Kennedy filed another grievance regarding the Notice of Removal, and

it was reduced to a suspension and Last Chance Agreement [DE 114 at 101-102; DE 115 at 148-

49; DE 117 at 97; DE 99-22].  Kennedy signed the LCA on April 28, 2008 [DE 114 at 104; DE

99-22].  The LCA provided that Kennedy would maintain "satisfactory attendance," meaning no

more than three unscheduled absences, excluding those covered by the FMLA, during any six

month period following the signing of the agreement [DE 99-22].  Unscheduled absences

included any absence not scheduled and approved in advance of Kennedy's scheduled start time,

including tardiness, emergency leave, such as emergency annual leave or sick leave, and failure

to report or remain as scheduled for overtime or holiday work [*Id*.].  As noted, FMLA leave was

specifically excluded from the definition of "unscheduled absences" [DE 99-22; DE 117 at 21].

The LCA also required Kennedy to retire as soon as she was eligible to do so [DE 99-22 at ¶ 11].

All of the foregoing is by way of background to set the stage for the facts surrounding

Kennedy's firing. The ultimate question is whether Kennedy's subsequent absences were covered

by FMLA or not.  Here's what happened: on June 24, 2008, Kennedy arrived at work at 5:40

a.m., forty minutes late for her 5 a.m. start time [DE 114 at 121-22].  The night before, Kennedy

took medication for a migraine headache, which caused her to sleep through her alarm the

following morning [DE 114 at 122, 124].  After 5:00 a.m., she called into the Post Office and

spoke to another clerk, Bernice Gillis, and told her that she was going to be late and was on her

way to work [DE 114 at 121-23].  She did not call in to the eRMS system or a supervisor [DE

114 at 123]. The Postal Service maintains that Kennedy should have informed a supervisor of her absence [DE 115 at 57]. At her deposition, Kennedy indicated that this was an "unscheduled absence," but that Poindexter later approved the absence [DE 114 at 123]. The Form 3971 that was generated at the time indicates that Kennedy was ineligible for FMLA. Yet the form also indicated that her estimated eligibility date was March 19, 2008 – approximately three months *prior* to her absence [DE 131]. In other words, the form was internally inconsistent.

On July 1, 2008, Kennedy called the eRMS system and again requested FMLA leave for the entire day because of a migraine [DE 114 at 124-25]. At the time, she did not have an FMLA approved case number, but understood that USPS would send her paperwork later [DE 114 at 125]. The following day, Kennedy spoke to Poindexter about the absence and provided her documentation – a Return to Work form – from her doctor [*Id.*]. Later, Kennedy provided Poindexter with the FMLA paperwork that her doctor completed [De 114 at 127-28]. Once again, the USPS denied Kennedy's request for FMLA leave, because she had not worked 1250 hours during the preceding 12 months: she had worked only 1082.48 hours on the day of the request [DE 114 at 129]. But again, the Form 3971 that was generated tells a different story; it indicates that Kennedy was be eligible for FMLA on March 19, 2008 [DE 132]. Kennedy contacted FMLA coordinator Velma Coles regarding the denial, but never heard back from her [DE 114 at 129-30]. At the time, based on the previous indication that she was eligible for FMLA as of March 19, 2008, Kennedy thought that she had worked the requisite 1250 hours [DE 114 at 130, 255].

On September 15, 2008, Kennedy missed work because of a major flood in the area: Kennedy was unable to get out of her subdivision and area roads were closed [DE 114 at 130-31,

135].  Kennedy called in to the eRMS system at 3 a.m. and requested emergency annual leave
[*Id.*].  The Hammond Post Office was open that day [DE 114 at 137; DE 118 at 9].  On
Kennedy's Form 3971 for the September 15, 2008 absence, which was generated by her
supervisor, Kennedy signed the form and wrote "flood" [DE 114 at 137].  Black asked Kennedy
to provide additional documentation regarding the flood, which she did [DE 117 at 26; DE 114 at
137-40, DE 114-1 at 277-78; DE 99-25; DE 99-26].  Black rejected the documentation, but
would not tell Kennedy what documentation was appropriate [DE 114 at 139-40; DE 114-1 at
277].

Ironically, Black herself was unable to make it in to work on the day because of the flood.
She called in her absence to Bush directly on the day before the flood, because she had Bush's
cell phone number, and her absence was thus counted as "scheduled," even though she was not
required to bring in documentation of the flood, as was required of Kennedy [DE 117 at 26; DE
116 at 41-42, 46, 87].  Kennedy, on the other hand, did not have Bush's number and could not
call her [DE 114-1 at 320].  Kennedy also contends that Black did not actually call Bush until the
day of the flood, and not prior to her absence [DE 118 at 27].  Ultimately, Bush concluded that
Kennedy's absence was "unscheduled" and in violation of the LCA [DE 117 at 26].

USPS can make a determination that an employee's absence is due to an "Act of God" if
a weather condition results in a group of employees being absent [DE 117 at 60, 100-101, DE
115 at 141-42].  The policy defines an "Act of God" as involving "community disasters such as
fire, flood, or storms.  The disaster situations must be general rather than personal in scope and
impact, and must prevent groups of employees from working or reporting to work" [DE 135 at
1].  The Great Lakes District headquarters decides whether the "Act of God" policy is applicable

or not, and curiously the flood in this case was not considered an "Act of God" [DE 117 at 60, 100-101, DE 115 at 141-42].

On October 21, 2008, Kennedy had another unscheduled absence from work [DE 99-37 at 63]. On her way to work that morning, Kennedy had a migraine headache that caused her to pull her car off the road and throw up [*Id.*]. When she got to work that morning at 5:33 a.m., she told her supervisor, Harris, what happened [DE 114 at 142; DE 114-1 at 251]. She filled out a 3971 form, but did not indicate on the form that she wanted the absence to be counted as FMLA leave, so Harris did not indicate that he had approved the absence and that FMLA approval was pending – instead, he approved the absence, and indicated that it was "not FMLA" [DE 118 at 41-43; DE 99-31]. Kennedy herself wrote "migraine" on the leave slip [DE 118 at 15; DE 114-1 at 247; DE 99-27]. According to Harris, he does not recall "migraine" being on the form when he signed and approved it [DE 99-36 at 16]. Kennedy went to the doctor after work that night, and claims that she obtained a return to work form from the doctor that she gave to Bush [DE 114 at 142-46]. Bush denies ever receiving such a form [DE 117 at 57, 98]. Kennedy claims that Bush threw away the documentation [DE 114-1 at 288]. Kennedy did not give Harris an FMLA certification form, nor did Harris (or any other Postal Service employee) request that Kennedy provide one [DE 118 at 47; DE 114 -1 at 257].

According to Kennedy, she was eligible for FMLA on October 21 [DE 114 at 165, 217, 219]. The basis for that conclusion is that as of December 18, 2008, she had worked 1826.24 hours, and thus, in October 2008, she would have had approximately 1500 hours [DE 117 at 26, DE 101-1; DE 114 at 219; DE 115 at 114]. According to USPS, Kennedy was ineligible for

FMLA on October 21, 2008, but it no longer has access to documents indicating her ineligibility or has not otherwise produced them [DE 125 at 3-4].

Kennedy was eventually fired for violating the terms of the Last Chance Agreement. According to Bush, she looked in the Postal Service's records and concluded that none of Kennedy's absences were covered by FMLA, because Kennedy had no FMLA approval [DE 117 at 11-12, 65, 92-93]. But this conclusion needs to be put in context. According to Poindexter, when Kennedy's initial termination was changed to a Last Chance Agreement, Bush and Black said that they would "get" Kennedy the next time – meaning that they would figure out a way to have Kennedy terminated [DE 115 at 25-26; 28-30]. Bush has denied these allegations [DE 117 at 81]. According to Poindexter, Kennedy was a good employee who was "very quick" at sorting the mail, and Poindexter had no problems with Kennedy's performance [DE 115 at 40].

To support her claim that Bush and Black were out to get her, Kennedy claims that she was repeatedly harassed by Black and Bush. For example, according to Kennedy, Black stood too close to her while she was working [DE 114 at 151; DE 115 at 35, 42-43]. Poindexter never saw Black stand close to any other clerks, and to Poindexter's knowledge, no other clerks were disabled or taking FMLA leave [DE 115 at 43]. According to Kennedy, Black repeatedly called her "crazy" and talked about her medical history to other employees [DE 114 at 155; DE 115 at 31-33]. Black does not recall saying this [DE 116-1 at 331]. But Poindexter supports Kennedy's story; she too heard Black telling Kennedy that she was crazy and that she needed to "take a pill." She also heard Black and Bush talking with one another about how "crazy" Kennedy was [DE 115 at 35-36]. Another employee, Kathryn Grochowski, also saw Black stand close to Kennedy, call her crazy, and tell her to take a pill [DE 129 at 2]. As further evidence that they were out to

get Kennedy, Poindexter recounted an incident where she wanted to call Kennedy in for an overtime shift, because she was an efficient worker, but Black would not allow her to do so [DE 115 at 75-79]. Poindexter said that Black would often remove Kennedy from shifts where Poindexter had scheduled her to work, and that Black would call Kennedy for overtime shifts, let the phone ring once, and hang up, as a way to avoid giving Kennedy overtime shifts [DE 115 at 78-79].

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light most favorable to the nonmoving party. *Id*. at 255.

### I.      Kennedy's FMLA Claims

To be eligible for FMLA protection at all, an employee must have been employed (1) for at least 12 months by the employer from whom leave is requested, and (2) for at least 1,250 hours of service with that employer during the 12-month period preceding the commencement of the requested leave. *Pirant v. U.S. Postal Serv.*, 542 F.3d 202, 206 (7th Cir. 2008); 29 U.S.C. § 2611(2); 29 C.F.R. § 825.110(a).

An employee can make two different kinds of claims of violation of the FMLA, one for interference with FMLA benefits and the other for retaliation in the form of punitive treatment of

an employee who requests FMLA leave. A successful interference claim shows that the employer

denied the employee FMLA rights to which the employee was entitled; the difference between it

and a retaliation claim is that a retaliation claim requires a showing of the employer's retaliatory

intent. *Shaffer v. AMA*, 662 F.3d 439, 443 (7th Cir. 2011); *Kauffman v. Fed. Express Corp.*, 426

F.3d 880, 884 (7th Cir. 2005). Kennedy has alleged both kinds of claims, and I will address each

in turn.

However, before I get to that, there is one procedural item to dispense with: USPS has

argued that Bush, Black, and Harris cannot be held individually liable under the FMLA because

they were not "at least partly responsible for the alleged violation" [DE 99 at 31], citing *Austin v.*

*Cook Cty.,* 2009 WL 799488, at *3 (N.D. Ill. March 25, 2009). But as shown below, there are

fact questions about how involved in the alleged FMLA violations each was. On the question of

whether an individual can be liable under the FMLA, the answer appears to be yes. The plain

language of the statute defines "employer" as "*any person* who acts, directly or indirectly, in the

interest of an employer to any of the employees of such employer" (emphasis added).29 U.S.C. §

2611(4)(A)(ii)(I)[2]. In other words, the statute explicitly provides for individual liability, so there

is no reason to grant summary judgment to Harris, Bush, or Black on this basis.

### A.    FMLA Interference Claim

To prevail on an FMLA interference claim, a plaintiff must establish that: "(1) she was

eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was

---

[2] I have been unable to find a case where the issue of individual liability under the FMLA
has been addressed by the Seventh Circuit or the United States Supreme Court. But it appears
that district courts generally agree that individuals can be held liable under the FMLA. *See, e.g.,*
*Austin*, 2009 WL at *3; *Shockley v. Stericycle, Inc.*, 2013 WL 5325632, at *3-4 (N.D. Ill. Sept.
19, 2013); *Barnes v. LaPorte Co.*, 621 F. Supp. 2d 642, 644-45 (N.D. Ind. 2008).

entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Goelzer v. Sheboygan Cty.*, 604 F.3d 987, 993 (7th Cir. 2010) (citation omitted).

Here, there are a number of factual discrepancies which preclude summary judgment on the FMLA interference claim. First of all, there are factual disputes regarding whether, as to a number of her absences, Kennedy had worked the requisite 1250 hours to be eligible for FMLA protection: as to the June 24, 2008 absence, the Form 3971 that was generated at the time indicates that Kennedy was ineligible for FMLA, but that her estimated eligibility date was March 19, 2008 – approximately three months *prior* to her absence [DE 131]. Similarly, on July 1, 2008, the Form 3971 that was generated indicated that Kennedy would be eligible for FMLA on March 19, 2008 [DE 132].[3] And on October 21, 2008, Kennedy claims that based on paperwork she received, she had worked more than 1250 hours [DE 117 at 26; DE 101-1; DE 117 at 219; DE 115 at 114]; but USPS – without being able to produce documentation to that effect – asserts that Kennedy was ineligible for FMLA on that date [DE 125 at 3].

While there is no dispute as to whether the USPS was covered by the FMLA [DE 99 at 2, n.3], there are factual disputes regarding whether or not Kennedy was entitled to take FMLA leave, whether her notice was sufficient, and whether the USPS denied her benefits to which she was entitled (in this case, the benefit being time off of work without counting absences as "unscheduled" and thus strikes against her under the LCA).

---

[3]USPS has produced the letter it provided to Kennedy denying this request for FMLA leave on this date, and it indicates that Kennedy had only 1082.48 hours at the time [DE 99-14; DE 99-15].

An employee is entitled to FMLA leave if (1) she is afflicted with a "serious health condition" and (2) that condition renders her unable to perform the functions of her job. *Burnett v. LFW, Inc.*, 472 F.3d 471, 477-78 (7th Cir. 2006), citing 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is one where the employee has "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." *Id.*, citing 29 U.S.C. § 2611(11). And migraines are specifically excluded from list of ailments that are not generally considered serious health conditions under the FMLA. 29 C.F.R. § 825.113(d). Here, there is evidence that Kennedy's migraines, for which she repeatedly saw a doctor, rendered her unable to perform her job duties.

The Postal Service contends that Kennedy did not provide adequate notice of her desire to take FMLA leave on multiple occasions, because she did not provide proper documentation or follow the appropriate procedures. Specifically, USPS contends that on June 24, 2008, Kennedy was late for work, that she did not speak to a supervisor, and that she did not use the eRMS system to call in and request to open an FMLA case [DE 99 at 26-28]. In a case like Kennedy's, where the employee did not have an open FMLA case, the employee could request to open a new case using the eRMS system. The parties agree that "[w]hen the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). Additionally, "[i]t generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable to such leave." *Id.*

In this case, the USPS policy required an employee in such a situation to provide appropriate notice and documentation within fifteen days, and the Postal Service claims that Kennedy failed to do so. Kennedy has responded that the USPS was on notice of her need for FMLA leave for her migraines, because she had previously requested such time off [DE 112 at 5], and therefore, at the time she requested leave, she provided "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). According to Kennedy, she provided notice as soon as was practicable, because she spoke to a fellow clerk on the telephone to report that she would be late, as no supervisor was available that morning, and that she spoke to a supervisor about why she was late – because she had taken migraine medicine – as soon as she was able to do so [DE 114 at 122-24].

So could a reasonable jury find that Kennedy appropriately requested FMLA leave on June 24, 2008? The answer is yes, for "an employee can be completely ignorant of the benefits conferred by the FMLA and still be entitled to its protections," so the "pertinent question" is whether the employee puts the employer on inquiry notice that she wanted FMLA-qualifying leave." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 826 (7th Cir. 2011), citing *Stoops v. One Call Commc'ns., Inc.*, 141 F.3d 309, 312 (7th Cir.1998). To put an employer on inquiry notice, the employee need not refer specifically to the FMLA – she just has to alert the employer to the seriousness of her health condition. *Id.* Once she does so, then it is the employer's duty to request additional information from the employee's doctor or some other source to confirm whether the employee is entitled to FMLA leave. *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 724-25 (7th Cir. 2007). Here, it is for a jury to determine whether Kennedy's notice on this date

should have put the Postal Service on inquiry notice that she had a potentially serious health condition that could qualify for FMLA leave.

Additionally, the USPS claims that Kennedy did not properly request FMLA leave on October 21, 2008, the date when she wrote "migraine" on her Form 3971 [DE 99 at 29-30; DE 99-27]. Kennedy claims that writing "migraine" on the form was sufficient to put USPS on inquiry notice [DE 112 at 9-10] of her need for leave, but USPS contends that Kennedy may have written "migraine" on the form after her supervisor signed it. When Kennedy wrote "migraine" – and thus provided notice of her condition to USPS – is a factual question that must be decided by a jury. Additionally, Kennedy went to the doctor that day and asserts that she provided medical documentation to Bush [DE 114 at 145], but that Bush threw it away, which Bush denies [DE 117 at 98] – a clear factual dispute that needs to be resolved by a jury. Again, it is a jury question whether Kennedy put USPS on inquiry notice of her need for FMLA leave for a serious medical condition. Though the USPS argues that Kennedy writing "migraine" on the leave form is analogous to simply calling in "sick" without providing further information, *see Burnett*, 472 F.3d at 479, it is entirely plausible that a reasonable jury would find that in conjunction with her prior health problems and need for FMLA leave, Kennedy gave enough information that USPS should have requested further follow up.

If, as Kennedy claims, her absences should have been protected by the FMLA leave, she was entitled to FMLA leave, and she properly submitted notice of her desire to take leave, she should not have been terminated for violating the LCA. In that case, the USPS would have "denied her benefits to which she was entitled" – specifically, taking FMLA leave and thus permitting her to continue her employment as opposed to being discharged for excessive

absenteeism, under the terms of the LCA.  Accordingly, a jury must decide these issues.  The cross-motions for summary judgment on Kennedy's FMLA interference claim are thus **DENIED**.

### B.   FMLA Retaliation Claim

An employee claiming FMLA retaliation may make his case under the familiar direct or indirect methods of proof developed in other employment retaliation contexts. *Goelzer*, 604 F.3d at 995; *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). To prevail under the direct method, Kennedy must show that (1) she engaged in a protected activity; (2) that USPS took an adverse employment action against her; and (3) that there is a causal connection between the protected activity and the adverse employment action.  *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012).

Here, based on the discussion above, it is a jury question as to whether Kennedy engaged in the protected activity of taking FMLA leave.  There is no dispute that she was subjected to an adverse employment action: she was terminated.  So the question is simply whether there is a causal link between the two.  Under the direct method, Kennedy must offer evidence that USPS intended to punish her for exercising her FMLA rights.  She can do this directly (by showing that USPS has essentially admitted its wrongful intent) or circumstantially (by showing a "convincing mosaic"of evidence that allows the jury to infer intentional discrimination). *Cole v. Ill.*, 562 F.3d 812, 815 (7th Cir. 2009); *Buie*, 366 F.3d at 503 (citations omitted).  Plaintiffs taking the "convincing mosaic" route can present any of three broad types of circumstantial evidence. *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011).  The first type includes evidence of "suspicious timing, ambiguous statements oral or written, behavior

toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* The second type is evidence showing that the employer "systematically treated other, similarly situated . . . employees better." *Id.* Finally, the plaintiff may point to evidence that he suffered an adverse employment action and that the employer's justification is pretextual. *Id.* A plaintiff in an FMLA retaliation case need only show that retaliation was *a* reason for the action taken by the employer; it need not be *the* reason. *Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 741-42, (7th Cir. 2008). In other words, a plaintiff need only show that retaliation was a substantial or motivating factor; it need not be the only factor for taking the adverse action. *Id.*

Here, there is sufficient evidence to create a triable issue of fact as to the "convincing mosaic" to deny summary judgment for the USPS on this claim. There is evidence that Bush and Black said that they would "get" Kennedy after her initial termination for absenteeism was reduced to a Last Chance Agreement. Taking the evidence in the light most favorable to Kennedy, this evidence directly supports her theory that she was fired for taking FMLA leave for her health condition (and arguably rises to the level of a direct admission of wrongful intent). There is also evidence that Bush and Black referred to Kennedy as "crazy" and that she needed to "take a pill," that they pulled mail from Kennedy's hands and tried to intimidate her by standing extremely close to her – some of which started soon after Kennedy's termination was reduced to a Last Chance Agreement. A reasonable jury could find that this evidence constitutes sufficient "bits and pieces from which an inference of discriminatory intent might be drawn." *Silverman*, 637 F.3d at 734. Accordingly, summary judgment is also not appropriate on this claim, and the motions are **DENIED**.

## II.    Disability Discrimination

Kennedy has also brought a claim of disability discrimination.  In considering an earlier

motion to dismiss in this case, I apprised Kennedy that "the ADA does not apply to claims of

employment discrimination by the federal government." [DE 61] Instead, the Rehabilitation Act,

29 U.S.C. § 701 *et seq.* is the appropriate vehicle for her disability discrimination claim.

However, courts look to the case law under the ADA to determine whether a plaintiff in a

Rehabilitation Act case has established his prima facie burden.  *Scheerer v. Potter*, 443 F.3d 916,

918-19 (7th Cir. 2006).

The Americans with Disabilities Act and the Rehabilitation Act prohibit employers from

discriminating against disabled employees because of their disability.  42 U.S.C. § 12112(a); 29

U.S.C. § 794(a); *see Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008).  It appears that Kennedy

seeks to articulate both a failure to accommodate claim and a disparate treatment claim.  Under

both approaches, a plaintiff must show that she is a qualified individual with a disability.

*Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

So the first issue is whether Kennedy has a disability as defined by the ADA, which states

that an individual has a disability if she has: "(A) a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (B) a record of

such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

USPS has taken the position that there are "insufficient facts in the record to establish that

Kennedy had a disability, however, for purposes of this motion, we contend it is moot because

Kennedy cannot establish the other elements of a prima facie case" [DE 99 at 37].  I take this as a

concession, at least for purposes of summary judgment.  Kennedy argues that she is in fact

"disabled" because her migraines, sinus problems, and depression, and that USPS well knew this as long ago as 2002 [DE 112 at 21]. So for present purposes, and in the absence of evidence or argument from the USPS to the contrary, I will assume without deciding that Kennedy was disabled by virtue of the fact that her migraine headaches rendered her unable to perform major life activities, such as working or caring for herself, and that the major life activity of the operation of a major bodily function – her digestive system – was substantially limited. *See* 29 C.F.R. § 1630.2(i)(1)(I).

"To establish a prima facie case for failure to accommodate, 'a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability.'" *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013), quoting *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir.2011). The Postal Service argues that it is entitled to summary judgment because there is no evidence that Kennedy ever requested an accommodation – rather, she simply asked for time off of work because she was ill [DE 99 at 31]. Kennedy maintains that she was disabled, by virtue of her migraines, sinus problems, and depression; that the USPS knew that she was disabled because of her prior FMLA leave and because she told them about her health problems up until the time that she was terminated; and that she requested an accommodation of short periods of absence, which she was denied.

Though not addressed by the parties, a brief discussion of the reasonableness of the requested accommodation is appropriate here: Kennedy has argued that brief periods of absence would be a reasonable accommodation that would allow her to perform her job. However, "[t]he fact is that in most cases, attendance at the job site is a basic requirement of most jobs,"

*Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999), and "[n]ot working is not a means to

perform the job's essential functions." *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 380-81 (7th Cir.

2003). It would logically seem, then, that ". . . in most instances the ADA does not protect

persons who have erratic, unexplained absences, even when those absences are a result of a

disability." *Waggoner*, 169 F.3d at 484. But the inquiry is apparently not that simple, for the

Seventh Circuit has declined to establish "a hard-and-fast rule that no absences from work need

be tolerated," and indicated that courts should "look to the reasonableness of an accommodation

of a requested medical leave." *Id.* at 485. It has even gone so far as to recognize that though

inability to work for months at a time removes a person from the class of people protected by the

ADA, "[t]ime off may be an apt accommodation for intermittent conditions. Someone with

arthritis or lupus may be able to do a given job even if, for brief periods the inflammation is so

painful that the person must stay home." *Byrne*, 328 F.3d at 381. In other words, it would seem

that if Kennedy's migraines were an "intermittent condition" that simply required the USPS to

give her "brief periods" to stay home, then the requested accommodation might be reasonable. In

any event, "[t]he reasonableness of a requested accommodation is a question of fact," so this is

yet another determination that must be made by a jury. *Haschmann v. Time Warner Ent. Co.,

L.P.*, 151 F.3d 591, 601 (7th Cir. 1998).

Given the facts in this case, a reasonable jury could find that Kennedy apprised the USPS

that she had a disability, that she asked for short periods of absence as an accommodation, and

that USPS failed to provide that accommodation. Accordingly, summary judgment is not

appropriate on her failure to accommodate claim.

Similarly, USPS is not entitled to summary judgment on Kennedy's other disability claim, which is for disparate treatment. Disparate treatment claims under the ADA can proceed under the direct or indirect method. Kennedy has chosen to proceed under the indirect method [DE 112 at 21] and thus must first establish a prima facie case of discrimination by showing that (1) she is disabled under the ADA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir.2011). As discussed above, it is a question for a jury whether Kennedy was in fact disabled. There is evidence in the record that Kennedy was good at her job and performed well – Poindexter, her supervisor, testified that Kennedy was efficient and a good worker. There is no dispute as to whether she suffered an adverse employment action, as she was fired. So the real point of contention here is whether Kennedy can point to similarly situated employees without disabilities who were treated more favorably.

To that end, Kennedy argues that "she was treated differently with respect to the September 15, 2008 absence – the one caused by the flood – in that her absence was counted as 'unscheduled' and she was forced to bring documentation whereas Black's absence was 'scheduled' and did not have to provide documentation" [DE 112 at 21-22]. "Whether a comparator is similarly situated is usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Coleman*, 667 F.3d at 846-47 (internal quotations and citation omitted). Typically, a plaintiff must show that the comparators (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such

differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847, quoting *Gates v. Caterpillar*, 513 F.3d 680, 690 (7th Cir. 2008). Though Black and Kennedy had differing job titles and Black was more senior, "[i]n the context of this case of differential discipline . . . [t]he question is not whether the employer classified the comparators in the same way, "but whether the employer subjected them to different employment policies. Comparators need only be similar enough to enable "a meaningful comparison." *Coleman*, 667 F.3d at 848 (internal citations and quotations omitted). And in a disparate discipline case, "an allegation that other employees involved in acts against [the employer] of comparable seriousness received more favorable treatment is adequate to plead an inferential case of discrimination." *Id.* at 850 (internal citations and quotations omitted).

Here, the common supervisor was Bush. Both Kennedy and Black were subject to the same Postal Service policies regarding absenteeism and the manner in which they were to report absences. And they both engaged in the same conduct: they were absent due to a flood in the area, but Black's absence was classified as "scheduled" and Kennedy's was classified as "unscheduled," which put her in violation of her Last Chance Agreement. Taking the evidence in the light most favorable to Kennedy, a reasonable jury could find that this evidence is sufficient to prove that Black, a similarly situated non-disabled employee, participated in the same conduct as Kennedy, but was treated more leniently, and thus, an inference of discrimination is appropriate.

The Postal Service claims that it had a legitimate, non-discriminatory reason for treating Kennedy and Black's absences differently: Black called Bush's cell phone over the weekend to apprise her that she would not be able to come to work, and Kennedy did not. To show that this

reason is pretextual, Kennedy must present evidence that suggests that the proffered reason is a lie – that the Postal Service did not honestly believe that this was the reason for treating the absences differently. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). There is evidence in the record to suggest that Bush had announced that she was going to "get" Kennedy, and have her fired. Moreover, there is also evidence to suggest that Black did not in fact speak to Bush about her absence until the day of the flood – September 15, 2008 [DE 118 at 27; DE 117 at 84-85]. These disputed facts indicate that summary judgment is not appropriate on this claim. Accordingly, the motions for summary judgment are **DENIED**.

### III.    Age Discrimination

The ADEA provides that it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). As discussed above, to prevail on a discrimination claim under the ADEA, Kennedy may again proceed under either the direct or indirect method of proof. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Under the direct method, a plaintiff must present direct and/or circumstantial evidence that "'points directly' to a discriminatory reason for the employer's action," whereas under the indirect method, she must adhere to the *McDonnell Douglas* burden-shifting formula. *Id.* at 671. Kennedy appears only to proceed under the direct method, and can meet her burden of proof by offering direct evidence of animus—the so-called "smoking gun"—or circumstantial evidence which establishes a discriminatory motive on the part of the employer through a longer chain of inferences." *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297-98 (7th Cir. 2010). "Circumstantial evidence can take many forms, including

suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group, evidence showing that similarly situated employees outside the protected class received systematically better treatment, and evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Id*. at 298 (internal citations omitted).

Here, Kennedy has presented two pieces of evidence: first, that she was terminated when she had worked for the USPS for 29 years, and was only six months shy of receiving full retirement benefits [DE 112 at 24]. Second, she has also argued that the provision in the Last Chance Agreement that required her to retire upon becoming eligible is circumstantial evidence of age discrimination [*Id.*].

Even taking this evidence in the light most favorable to Kennedy, there is nothing that points "directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7ᵗʰ Cir. 2003). As to Kennedy's proximity to retirement, "suspicious timing alone is rarely enough to survive summary judgment." *Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7ᵗʰ Cir. 2013). And "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (internal citations omitted). Here, the fact that Kennedy was near retirement, and then fired (because, according to the USPS, she violated her Last Chance Agreement), hardly "points directly" to an inference of age discrimination. And the provision in the LCA requiring Kennedy to retire upon eligibility is

similarly unavailing: first of all, the provision was not invoked – Kennedy was fired because of absenteeism, not because she failed to retire upon eligibility.  But as to evidence of the USPS' discriminatory intent, it is similarly unhelpful to Kennedy.  The provision was part of an agreement that afforded her the opportunity to *continue* working at the USPS in lieu of termination – it wasn't an attempt to force her "to take early retirement by an explicit or implicit threat to fire (or otherwise punish) [her] because of [her] age if [she] did not." *Karlen v. City Colleges of Chicago*, 837 F.2d 314, 317 (7th Cir. 1988), citing *Henn v. National Geographic Society*, 819 F.2d 824 (7th Cir.1987).  In other words, if USPS had a discriminatory intent and wanted to fire Kennedy before she was eligible for retirement, it makes no sense that it would include, in a document *extending* her employment, a provision that allowed her to continue working until she was eligible for retirement benefits.  The inclusion of the retirement requirement in the LCA was in fact to Kennedy's benefit here, and thus cannot establish a discriminatory animus.  USPS' motion for summary judgment on the claim of age discrimination is **GRANTED**.

## CONCLUSION

For the reasons above, the Defendants' Motion for Summary Judgment [DE 98] is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **DENIED** as to Kennedy's Count I, FMLA Interference; Count II, FMLA Retaliation; and Count III, Disability Discrimination.  The motion is **GRANTED** as to the claims of age and race discrimination. Plaintiff's Cross-Motion for Summary Judgment [DE 112] is **DENIED**.  The Defendants' Motion to Strike [DE 156] is **GRANTED**.

The Court now sets a telephonic status conference for **Thursday, April 10, 2014 at 10:30 a.m.** Hammond/Central time.  The purpose of the telephone conference will be to select dates for the Final Pretrial Conference and Settlement Conference and trial.  As a courtesy, the Court will initiate the telephone conference by placing calls to the first attorney listed on the docket for each party, at the phone number shown there.  If different or additional attorneys wish to be included in the telephone conference, or a different telephone number should be used, counsel must contact Judge Simon's Case Manager at (219) 852-6724 no later than 24 hours prior to the time the conference is to occur.

**SO ORDERED**.

ENTERED: March 17, 2014                    /s/ Philip P. Simon
                                           PHILIP P. SIMON, CHIEF JUDGE
                                           UNITED STATES DISTRICT COURT